UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

-against-

ISHOPNOMARKUP.COM, INC, SCOTT
W. BROCKOP, ANTHONY M. KNIGHT,
and MOUSSA YEROUSHALMI a/k/a
MIKE YEROUSH,

Defendants.

------------------------------------------------------X



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ SEP -3 2015 ★
LONG ISLAND OFFICE

**MEMORANDUM AND ORDER**
**04-CV-4057 (DRH)(ARL)**

**APPEARANCES:**

**For the Plaintiff:**
**Securities and Exchange Commission**
3 World Financial Center
Room 4300
New York, NY 10281
By:     Alexander M. Vasilescu, Esq.
        Christopher J. Dunnigan, Esq.

**For the Defendant:**
**Anthony M. Knight,** *pro se*
330 A Street
Suite 152
San Diego, CA 92101

**HURLEY, Senior District Judge:**

Having heard testimony over approximately fourteen trial days, the jury in this case

returned a verdict in favor of the plaintiff the Security Exchange Commission ("SEC" or

"plaintiff") and against defendant Anthony Knight[1] ("Knight" or "defendant") on the two claims

---

[1] The Court entered a default judgment against defendant Scott Brockop on October 26,
2006 (Docket Entry ("DE") 58), entered judgment as to defendant Moussa Yeroushalmi

before it. With regard to the first claim, the jury found that Knight violated Sections 17(a) of the Securities Act of 1933 ("the Securities Act") (15 U.S.C. § 77q(a)), Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), and Rule 10b-5 thereunder (15 U.S.C. 78j(b) and 17 C.F.R. § 240.10b-5). With respect to the second claim, the jury found that Knight violated "Section 5(a) or 5(c) of the Securities Act" (15 U.S.C. §§ 77e(a), 77e(c)). (Verdict Sheet, DE 257 at 2.)

Presently before the Court is defendant's post-trial motion seeking judgment as a matter of law or a new trial, pursuant to Federal Rules of Civil Procedure 50(b) and 59, respectively. Additionally before the Court is plaintiff's motion for post-trial relief. For the reasons set forth below, the defendant's motion is denied and the plaintiff's motion is granted to the extent developed more fully below.

## BACKGROUND

### I.     Overview

The background of this action is set forth in the prior decisions of this Court. Familiarity with those decisions is presumed.

In terms of the relevant statutory language, sections 5(a) and 5(c) of the Securities Act generally prohibit the use of interstate commerce to sell or deliver securities unless a registration statement filed with the SEC is in effect as to the securities, or to offer to sell securities unless a registration statement has been filed with the SEC as to the securities. Sections 17(a), 10(b), and 10b-5 generally prohibit fraud in connection with the sale of securities. More specifically, Section 17(a) reads:

---

("Yeroush") on December 9, 2010 (DE 150), and entered judgment as to iShopnomarkup.com on April 30, 2014 (DE 205).

It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Similarly, Section 10(b) makes it unlawful for any person "directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails" to:

Use or employ, in connection with the purchase or sale of any security. . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Finally, Rule 10b-5 provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

## II.    Legal Standard

### A.    Rule 50

Rule 50 "imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when '[the adverse] party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.' " *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011), *cert.*

3

*denied*, 132 S. Ct. 1741 (2012) (quoting Fed. R. Civ. P. 50(a)(1)); *accord Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 127-28 (2d Cir. 2012). The "burden is particularly heavy where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Cash*, 654 F.3d at 333 (internal quotation marks and citation omitted); *accord Cross v. N.Y. City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005). "Under such circumstances, the district court may set aside the verdict only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against him." *Cross*, 417 F.3d at 248 (citations, alterations, and internal quotation marks omitted); *accord Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 197-98 (2d Cir. 2014); *see also, e.g., Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) (stating that a Rule 50 motion may be granted only if the court concludes that "a reasonable juror would have been *compelled* to accept the view of the moving party" (internal quotation marks omitted)).

In deciding a motion under Rule 50, the Court must disregard any evidence that weighs against the jury's verdict unless the jury was required to believe it. *Zellner*, 494 F.3d at 370 (citing *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150-51 (2000)). The question is whether, if credibility assessments are made against the moving party and all reasonable inferences are drawn against the moving party, a reasonable jury nevertheless would have no choice but to find in the movant's favor. *Zellner*, 494 F.3d at 370-71 (citing *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993)). In other words the court may only grant a Rule 50 motion in this posture if there is " 'such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture, or . . . [there is] such an overwhelming

4

amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.' " *Cross,* 417 F.3d at 248 (quoting *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1046 (2d Cir. 1992)). "Judgment as a matter of law on an issue as to which the movant bears the burden of proof is rare." *Broadnax v. City of New Haven,* 415 F.3d 265, 270 (2d Cir. 2005) (internal quotation and citation omitted).

### B.    Rule 59

Federal Rule of Civil Procedure 59 provides that a Court may order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The standard for granting a new trial under Rule 59(a) is less stringent than the standard for judgment as a matter of law under Rule 50. *See, e.g., Manley v. AmBase Corp.,* 337 F.3d 237, 244-45 (2d Cir. 2003). Granting a new trial is appropriate where "the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice." *Nimely v. City of N.Y.,* 414 F.3d 381, 392 (2d Cir. 2005) (internal quotation marks and citations omitted). "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 134 (2d Cir. 1998). But when "a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice." *ING Global v. United Parcel Serv. Oasis Supply Corp.,* 757 F.3d 92, 99 (2d Cir. 2014) (internal quotation marks and citation omitted); *see also Raedle v. Credit Agricole Indosuez,* 670 F.3d 411, 417-19 (2d Cir. 2012) (noting that a district court judge "must exercise their ability to weigh credibility with caution and great restraint," and may not

"freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury" (quoting *DLC Mgmt. Corp.*, 163 F.3d at 134, and *United States v. Landau*, 155 F.3d 93, 104 (2d Cir.1998)).

## DISCUSSION

### I. Defendant's Arguments for a New Trial or Judgment as a Matter of Law

Plaintiff is correct in that generally "Defendant's submission . . . mainly consists of unsubstantiated attacks on the witnesses, opposing counsel and even the jury itself. That cannot provide a basis for a directed verdict or new trial. In addition to such attacks, his submission is nothing more than his own, self-serving, interpretation of the facts, which he is attempting to substitute for the lawful finding of the jury." (Pl.'s Mem. in Opp'n at 12.) Moreover, to the extent the defendant's 97 page moving submission contains any cognizable arguments for a new trial or judgment as a matter of law, the SEC categorizes them as follows:

> (1) improper and unsupported allegations of misconduct by the Commission and its employees; (2) Defendant's self-serving attacks on the credibility of the numerous witnesses (including his own) that provided testimony supporting the fraud and unregistered offering securities claims; (3) raising discovery arguments that he waived prior to the trial or which were properly decided by the Court; (4) attacking the service of the Jury; (5) arguing that iShopNoMarkup.com ("iShop") and others, not the Defendant, committed the securities law violations; and (6) claiming the jury instructions are flawed.

(*Id.* at 1.) The Court finds plaintiff's breakdown on target and will examine each of the categories in turn.

### a) Misconduct by the Commission

Knight argues that the SEC engaged in various forms of misconduct, all of which are unfounded. For example, he makes multiple unsubstantiated allegations that SEC attorneys Alexander Vasilscue and Christopher Dunnigan lied to the jury throughout the trial. He also

accuses the SEC of "illegal[ly] monitoring . . . all of defendant's communications in cooperation with the FBI," (Def.'s Mem. in Opp'n at 94), via, *inter alia*, speakers installed in the courtroom during the trial "that had a weird shape but seemed to be capable of pulling real–time information from other's computers in the Courthouse" (*id.* at 95-96). His characterization of the SEC attorneys' presentation of their case as "lies" is inappropriate and demonstrates a misunderstanding of the judicial process. Moreover, his wild speculations regarding the SEC's attempt to monitor his communications, not supported by any evidence, do not support his claim that a directed verdict or new trial is warranted.

**b) Attacks on the credibility of witnesses**

Defendant attacks the credibility of various witnesses. For example, he contends that the SEC's expert William Hicks is "heavily biased" towards the SEC and "was flown all over the country by the government at huge expense to testify for the government even though there were other qualified local experts in locations he was flown to." (*Id.* at 3.) Defendant also attempts to discredit the testimony of many of the plaintiff's witnesses whom he refers to as "disgruntled" former employees of iShop, including Vito Marrone, Matteo Patisso, Timothy Badeaux, and Radni Davoodi. (*Id.* at 16-18.) For example, he claims that Mr. Patisso "was heavily coached by the SEC" and "had a personal vendetta against defendant and his testimony was highly biased as a result." (*Id.* at 16.) He even posits that his own witness, iShop employee Yousseff Neissani, "agreed to say whatever the SEC wanted him to say in order to be kept out of the lawsuit." (*Id.* at 19.) Knight, however, was free to cross-examine these witnesses regarding any potential bias at trial, and to the extent that he did, the jury was not compelled to accept Knight's theories about these witnesses' potential prejudice. Therefore, the Court will not disturb the verdict of the jury.

**c) Discovery arguments that were waived prior to trial and already decided**

Defendant now complains that "[t]here were serious issues with [Ian] Noake[s]'s deposition." (*Id.* at 32.) In particular, he claims that the "deposition was not noticed" and that the deposition "referenced previous off-record conversations [Noakes] had had with the SEC." (*Id.*) As plaintiff points out, however, Knight raised these objections at the trial during the presentation of Mr. Noakes's video deposition, and the Court ruled that since nothing had been done "to preclude this information being placed before the jury in the years that have passed" since the deposition in 2006, "the 11[th] hour, 59[th] minute and 59[th] second" objection was overruled. (Tr. at 859-60.) Defendant has not raised any reason to overturn that ruling now.

**d) Attacks on the Jury**

Towards the beginning of his submission, defendant attempts to discredit the jury by claiming that the jurors reached their verdict simply because they were "tired" and wrote in a note to the Court that they "wanted to go home." (*Id.* at 5.) Defendant also claims that the jurors did not understand the securities laws and "did not necessarily take the time to correctly apply the instruction given and did not provide any basis for their findings other than they had reached a verdict and wanted to go home and in doing so came up with a verdict that no reasonable jury would have returned." (*Id.* at 81.) Defendant's attacks on the jury are baseless. As plaintiff points out, the note that Knight referenced merely indicated to the Court that they did not wish to deliberate that day beyond 5 p.m. after the Court gave them the option of doing so, not that they were unwilling to apply the Court's directions. Moreover, the jury is not required to provide a basis for their findings and need only record their findings in the verdict sheet, the language of which both parties in this case agreed upon prior to deliberations. Accordingly, the behavior of the jury in this case does not indicate that the verdict should be disturbed.

### e) iShop/others rather than Knight committed any violations

Throughout his submission, defendant insists that iShop "made representations [regarding its stock], not defendant Knight." (Def.'s Mem. in Opp'n at 30, 70.) However, it is undisputed that Knight was the chairperson of iShop, and as the SEC points out in its brief, there was sufficient evidence before the jury such that it could have reasonably concluded that Knight controlled iShop from his position as chairperson. In particular, Mr. Patisso testified that Knight "gave every single order in the company." (Tr. at 154.) In addition, Mr. Marone testified that Knight controlled the decision-making at iShop and "[i]t was his way or the highway." (Tr. at 440.) Similarly, Mr. Neissani and Mr. Davoodi also testified that Knight "ran" the company. (Tr. at 598, 2003.) Moreover Mr. Neissani testified that Knight controlled the board of directors and even made decisions without the approval of the board, such as the decision to move the company headquarters to Garden City and the decision to retain Knight-Mitchell, a company only consisting of Knight, for consulting purposes. (Tr. 2043-46, 2063.) Based on this evidence, the jury could have reasonably concluded that Knight was in charge of iShop and, as will be discussed more fully below, that he committed the alleged violations.

### f) The jury instructions were in error

Defendant takes issue with the Court's instruction that the Section 506 exemption from SEC registration requirements (17 C.F.R. § 230.506) does not apply if the defendant engaged in general solicitation of investors (Jury Instructions at 54-55), but does not provide any authority for that position. The Court finds no reason why that instruction was in error.

Based on these arguments, Knight has not demonstrated that he is entitled to judgment as a matter of law or a new trial.

## II.  Proof of Defendant's Violations

In addition to the arguments addressed above, to the extent defendant contends that the jury's verdict was inappropriate given the evidence at trial, the Court will now address each of the jury's findings and the evidence to support those findings.  Based on the evidence presented at trial, the Court cannot say that there was a complete absence of evidence such that the jury's finding for the plaintiff on the claims before it had to have been the result of surmise, requiring a directed verdict, or that their verdict resulted in a miscarriage of justice, requiring a new trial.

### A.  § 17(a)(2), 10(b) and 10b-5

The SEC contends that "[d]uring the trial, the Commission established that Knight and iShop made at least nine material misrepresentations or omissions to investors." (Pl.'s Mem. in Supp. at 5.)  However, the jury need only have found that Knight made one material misrepresentation or omission in order to find that he violated Section 17(a)(2) of the Securities Act and Rules 10(b) of the Exchange Act and 10b-5 thereunder. *S.E.C. v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013).  Here, there was sufficient evidence in the record such that the jury could reasonably find that Knight made a misrepresentation to investors.  For example, there was evidence to support the SEC's claim that Knight lied to investors in representing that iShop opened up foreign offices.  In particular, PX2, the September 21, 1999 offering document used to solicit investors in iShop's first and second rounds of offerings, states that iShop "maintain[ed] its corporate headquarters in Port Washington, New York, and also ha[d] branch offices in Hong Kong, Singapore and Sydney, Australia, and [would] soon be opening a branch office in Tokyo, Japan." (PX2 at 9.)  However, Mr. Patisso testified that in the period between the end of August 1999 and the end of September 1999, he was not aware of any

offices outside of New York." (Tr. at 139, 140-41.) Similarly, Mr. Marrone testified that iShop never had any offices in Hong Kong, Singapore, Sydney, or Tokyo. (*Id.* at 434.) Additionally, "Ian Noakes, who was to supply and help establish the foreign offices, testified that he never did so." (Deposition testimony of Ian Noakes at 13-16.) Even Knight himself testified that at the date of the offering document, iShop did not have any employees in Hong Kong. (Tr. at 1653.) Based on this evidence, there was a sufficient evidentiary basis for the jury to find that PX2 misrepresented to investors the status of iShop's foreign offices. Moreover, the jury could have reasonably found that the misrepresentation about iShop's offices was material, i.e., that it "would have been significant to a reasonable investor's investment decision." (Jury Instructions at 34.) Additionally, there was sufficient evidence presented that Knight either directly or indirectly made the statement about iShop's offices (see the discussion of Knight's control of iShop above and testimony from Mr. Neissani discussing how Knight had the "most knowledge" about and worked on the offering memoranda (Tr. at 2067)), and that he did so either knowingly or with a reckless disregard for the truth and in connection with the sale of iShop securities.[2] As a result, the Court cannot say that there was a complete lack of evidence such that the jury's findings that Knight violated Sections 17(a)(2) and 10(b) and 10b-5 must have been a result of surmise or that a miscarriage of justice occurred.

**B.** § 17(a)(1), (3)

The Court also denies Knight's motion with respect to §§ 17(a)(1) and (3) of the Securities Act because it was not unreasonable based on the evidence presented for the jury to find that Knight employed a "device, scheme, or artifice to defraud" investors, (§ 17(a)(1)), and

---

[2] Knight does not challenge the jury's finding that he made use of interstate commerce or the mails.

engaged in a "transaction, practice, or course of business which operate[d] or would operate as a fraud or deceit upon the purchaser" (§ 17(a)(3)). "Section 17(a)(1) and (3) of the Securities Act . . . create what courts have called 'scheme liability.' " *S.E.C. v. Jean-Pierre*, 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015). Here, the evidence presented is sufficient to support scheme liability because in addition to the evidence regarding the foreign offices above, the SEC demonstrated that Knight used the offering memoranda to make several misrepresentations regarding iShop and deceive investors regarding the legitimacy of the company. For example, at the time of the first offering, Knight misled investors regarding the amount of products it anticipated listing on its website. The initial offering memorandum dated September 21, 1999 stated that iShop had "signed letters of intent with suppliers of products to list approximately 3 million products on the Company's web site." (PX 2 at 8.) However, the jury could have reasonably found that the only documents before the jury from suppliers dated prior to September 21, 1999, PX 299[3] and DX-G,[4] were other than as represented.[5] There was also significant evidence that iShop's website was not "operational" to the extent mentioned in the

---

[3] PX 299 is a letter from William Fjetland, the President of CompuCorp Information Systems Inc. to Knight stating that it would "like very much to provide computers and peripherals for [the iShop] website" and states that it would "like to work with [Knight] to firm up [its] possibilities." Fjetland testified that this was not a letter of intent but a "communication letter" expressing a desire to communicate further and "develop what [iShop] wants." (Tr. at 1549-51.)

[4] DX-G is an email from Baker & Taylor explaining the types of products it could provide to iShop, but does not contain any reference to a future agreement or express any plan to enter into an agreement.

[5] The Court read to the jury the definition of a "letter of intent" from Black's Law Dictionary: "A written statement detailing a preliminary understanding of parties who plan to enter into a contract or some other agreement; a noncommittal writing preliminary to a contract." (Jury Instructions at 59-60.) Knight does not dispute that the parties stipulated to this definition. (Def.'s Mem. in Opp'n at 69.)

two offering memoranda, PX2 described above and PX5 dated February 3, 2000, as several employees as well as iShop's website consultant Christopher Wubbenhorst testified that the site was never capable of hosting millions of products that could be easily searched and used to ship and bill those products to customers. (Tr. 235, 430-431, 613-14, 887-89.) Based on this evidence a reasonable jury could conclude that Knight engaged in a fraudulent scheme under §§ 17(a)(1) and (3) of the Securities Act.[6]

C.    § 5(a) and (c)

Similarly, based on the evidence in the record a reasonable jury could find that Knight violated Section 5(a) or 5(c) of the Securities Act. It is undisputed that no registration statement was filed with the SEC with respect to iShop stock. Moreover, Knight does not challenge the jury's findings that the offerings were made through the use of interstate commerce or the mails in order to sell or offer to sell securities. Additionally, as previously discussed, there was ample evidence that Knight was responsible either directly or indirectly for these offerings as the chairperson and person in control of iShop.

Furthermore, the jury was not compelled to conclude that Knight was exempt from registration requirements pursuant to Rules 504 and 506 of the Securities Act (17 C.F.R. §§ 230.504, 230.506), exemptions which Knight had the burden of proving. Rule 504 exempts "offerings and sales of securities not exceeding $1,000,000." The Court accurately explained to the jury, however, that this exception is not applicable where two or more "integrated" offerings exceed $1 million. Moreover, there is no challenge to the Court's instruction that the jury

---

[6] As in the case of the misrepresentation concerning foreign offices discussed earlier, there was sufficient evidence that the other statements in the offering memoranda regarding letters of intent and the website were material and that Knight made them either directly or indirectly, in connection with the sale of securities, and either knowingly or with a reckless disregard for the truth.

consider whether any of iShop's three offerings were integrated, meaning that they took place

within 6 months of each other and met the five factor test for determining whether offerings are

integrated.[7]  Here, it was undisputed that iShop engaged in a series of three overlapping stock

offerings: the first offering, from October 1999 through early March 2000, raised approximately

$1 million; the second, in early 2000, raised an additional approximately $550,000; and the third,

from early 2000 through July 2000, raised an additional approximately $ 750,000, for a total of

$2.3 million.  Based on the timing of the offerings, and evidence regarding the consideration

received and the purpose of the offerings it was reasonable for the jury to determine that the

offerings were integrated, thereby precluding the 504 exemption, [8] and Knight has not pointed to

any evidence compelling a contrary conclusion.

Similarly, Knight has not pointed to any evidence compelling a finding that the 506

exemption was applicable.  As discussed above, Knight provides no explanation for his position

that the Court improperly instructed the jury that the 506 exemption is inapplicable where a

defendant engaged in general solicitation by telephoning customers, with whom there are no pre-

existing relationships, to sell an unregistered security.  Moreover, there was evidence presented

at trial that iShop was conducting a general solicitation through cold calling customers.  (Tr. at

143-44, 439, 817 (discussing iShop's "telemarketing" and cold calling methods).)  Additionally,

the 506 exemption is unavailable where an offering is made to one or more unaccredited

investors absent showing those investors an audited financial statement, and there was testimony

---

[7] This test requires consideration of whether the offerings are part of a single plan of
financing, whether the sales involve issuance of the same class of securities, whether the sales
have been made at or about the same time, whether the same type of consideration is received,
and whether the sales are made for the same general purpose. *See S.E.C. v. Cavanagh*, 445 F.3d
105, 112 n.17 (2d Cir. 2006).

[8] The SEC also provided testimony from an expert witness explaining that the stock
offerings were integrated. (Tr. at 137-40.)

14

at trial that such offerings to unaccredited investors took place. (*See* testimony of Rodney
Davoodi, Tr. at 621-22, 643) (discussing his status as an unaccredited investor and iShop's
failure to show him any audited financial statements). Therefore, the evidence presented at trial
was not such that a reasonable juror would have been compelled to find that either of these
exemptions applied, and Knight has not demonstrated that any miscarriage of justice occurred.
Therefore, Knight's motions pursuant to Rule 50 and 59 are denied.

## III. Relief Requested

### A.    Permanent Injunction Against Defendant Knight

The SEC requests that the Court "permanently enjoin Knight against future violations of
Sections 5 and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-
5 thereunder." (Pl.'s Mem. in Supp. at 12.) The Second Circuit has noted that "[i]njunctive
relief is expressly authorized by Congress to proscribe future violations of federal securities
laws," *SEC v. Cavanaugh*, 155 F.3d 129, 135 (2d Cir. 1998), as both the Securities Act and the
Securities Exchange Act each provide that the Court may issue injunctive relief in order to
prevent further violations of the securities laws. *See* 15 U.S.C. §§ 77t(b), 78u(d),(e), 78u-1.
Moreover:

> To determine whether a permanent injunction is warranted, courts
> consider the following factors: the fact that defendant has been
> found liable for illegal conduct; the degree of scienter involved;
> whether the infraction is an 'isolated occurrence;' whether
> defendant continues to maintain that his past conduct was
> blameless; and whether, because of his professional occupation,
> the defendant might be in a position where future violations could
> be anticipated.

*S.E.C. v. Contornis*, 2012 WL 512626, at *3-4 (S.D.N.Y. Feb 3, 2012) (quoting *S.E.C. v.
Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978)).

Applying these factors to the instant case, the Court finds that a permanent injunction is warranted. Here, the jury found defendant liable for violating each of the sections for which the SEC seeks a permanent injunction. Additionally, the jury found that Knight acted knowingly with an intent to defraud or with a reckless disregard for the truth at least with respect to the 10(b) and § 17(a)(1) violations. *See S.E.C v. Elecs. Warehouse, Inc.*, 689 F. Supp. 53, 59-60 (D. Conn. 1988) ("Violations of Sections 17(a)(1) and 10(b) and Rules 10b-5 . . . require a showing that defendant . . . intentionally or knowingly engage[d] in the prohibited activities . . . or act[ed] with reckless disregard for the truth or falsity of a material statement."). Although, this is the first time Knight faced legal allegations of violating securities laws, the Court notes the SEC's concern that "Knight, with his past claim to be an investment banker and claim to have worked on helping various public companies, together with his lack of remorse and law degree, gives him the ability to again seek a role as an officer or director at publicly traded companies and to again violate[] the antifraud and registration requirements of the federal securities laws." (Pl.'s Mem. in Supp. at 14.) Moreover, Knight's lengthy submissions arguing that others at iShop as opposed to himself were to blame for the conduct for which the jury found him liable as well as unfounded accusations that the SEC acted inappropriately throughout his case demonstrate his continued denial of any culpability. As a result, the preliminary injunction is granted.

**B. Defendant Should Be Barred From Serving as an Officer or Director**

The SEC requests that the Court "prohibit[] Knight from acting as an officer or a director of a public company." As the SEC notes, "[t]he Sarbanes-Oxley Act of 2002 . . . [provides] that a court may bar or suspend a person from serving as an officer or director of a public company if the person has violated Section 10(b) of the Exchange Act or the rules and regulations thereunder, or Section 17(a) of the Securities Act, and the officer's or director's conduct

demonstrates *unfitness* to serve as an officer or director." (Pl.'s Mem. in Supp. at 15.) In determining whether to impose this suspension, the Court may consider:

> (1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.

*S.E.C. v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995) (internal quotation marks and citation omitted).

In applying the factors enumerated above, the Court finds that it is appropriate to bar Knight from serving as an officer or director of a public company in the future. It is clear that the jury found Knight liable for five securities law violations, including § 10(b) and § 17(a)(1) violations which, as noted above, required a finding that Knight acted either knowingly or with a reckless disregard for the truth. Moreover, as discussed above, these violations occurred while Knight was the chairman of iShop. Furthermore, as noted above, Knight maintains a lack of blame and has failed to provide any assurances that he will not continue these types of violations in the future. This attitude coupled with his past violations leads the Court to believe that future violations would be likely to occur if he were permitted to again act as an officer or director of a public company. *See S.E.C. v. Posner*, 16 F.3d 520, 521-22 (2d Cir. 1994) (upholding officer and director bar where district court found that defendants committed securities law violations with a high degree of scienter and that "their past securities law violations and lack of assurances against future violations demonstrated that such violations were likely to continue"). As a result, prohibiting Knight from becoming an officer or director of another public company is appropriate here.

## C.    Disgorgement

The Second Circuit has made clear that "[o]nce the district court has found federal securities violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). "The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." *Id.* "The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation," and "any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id.* at 1475 (internal quotation marks and citations omitted).

The SEC requests that the Court "hold Knight liable for all the funds fraudulently obtained by iShop, the entity he created and controlled throughout the fraudulent and unregistered offering of securities." (Pl.'s Mem. in Supp. at 22.) It is undisputed that the amount of funds realized from the three stock offerings at issue is 2.3 million dollars and the Court finds that amount to be an appropriate measure of disgorgement. *See S.E.C. v. Tourre*, 4 F. Supp. 3d 579, 590 (S.D.N.Y. 2014) ("[T]he Second Circuit has upheld the disgorgement of the full amount of the 'proceeds' received from investors as a proper exercise of the district court's equitable powers" and "explicitly rejected an 'actual profits' approach.") (collecting cases). In terms of whether Mr. Knight should be held accountable for this amount, as discussed above, evidence at trial demonstrated that Knight was in control of iShop and primarily responsible for misrepresentations made in the offering memoranda that were used to solicit investors (PX2 and PX5). Moreover, "[w]here, as here, a defendant uses an entity as the vehicle for his or her fraud, the court may use that entity's profits as a measure of the appropriate disgorgement." *S.E.C. v.*

*Murray*, 2013 WL 839840, at *2 (E.D.N.Y. Mar. 6, 2013); *see also S.E.C v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 288 (2d Cir. 2013) ("Unlike the civil penalty, there is no statutory requirement that a disgorgement award be measured as to each individual defendant."). As a result, the Court deems it appropriate to hold Knight accountable for the entire $2.3 million realized from iShop's investors. *See First Jersey*, 101 F.3d at 1475 (finding that holding defendant liable for disgorgement of total amount of profits was not an abuse of discretion were defendant had been "primarily liable" for the frauds at issue, "intimately involved in their perpetration," and "a controlling person" of the company).

Furthermore, the SEC argues that the Knight "should pay prejudgment interest on his disgorgement" at the Internal Revenue Service's " 'underpayment rate,' which is a floating interest rate that the IRS uses to determine interest due on underpaid taxes." (Pl.'s Mem. in Supp. at 23.) According to the SEC, prejudgment interest at that rate from the period August 1, 2000 through October 31, 2014 equals $2,519,140.23. The Second Circuit has approved the IRS underpayment rate in SEC enforcement actions seeking disgorgement finding that it is appropriate given that it "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *First Jersey*, 101 F.3d at 1476. Similarly, the Court finds that rate appropriate here.

### D.    Civil Monetary Penalties

The Securities Act and the Exchange Act both provide for the imposition of monetary penalties against a defendant who commits a securities violation. 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3). "The civil penalties serve a dual purpose – to both punish the individual violator for his past violations and deter future violations of the securities laws." *See S.E.C. v. Murray*, 2013

WL 839840, at *3 (E.D.N.Y. Mar. 6, 2013) (internal quotation marks and citation omitted). The SEC argues that the Court should apply "third-tier civil penalties" pursuant to Section 20(d)(2)(C) of the Securities Act (15 U.S.C. § 77t(d)(2)(C)) and Section 21(d)(3) of the Exchange Act (15 U.S.C. § 78u(d)(3)). Such penalties are only appropriate where the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." Additionally, third-tier penalties are not to exceed "(I) $100,000 for a natural person or . . . (II) the gross amount of pecuniary gain to such defendant as a result of the violation." With respect to the first prong, the Court may impose $110,000[9] penalty for each of the defendant's violations. *See Murray*, 2013 WL 839840, at *3. As the SEC notes, "the Court could consider Knight's involvement in iShop's unregistered offerings as one violation. Or, the Court could consider the sale to each of the more than 350 investors as separate violations," yielding a penalty of $38,500,000. (Pl.'s Mem. in Supp. at 25 n. 13.) With regard to the second prong, however, the Second Circuit, has made clear that the language allowing an award based on the "gross amount of pecuniary gain *to such defendant*" (emphasis added), 15 U.S.C. § 77t(d)(2), "does not provide room" for the interpretation that a civil penalty be imposed jointly and severally. *S.E.C. v. Pentagon Capital Mgmt.*, 725 F.3d 279, 287-88 (2d Cir. 2013).

As discussed above, the defendant's actions involved fraud, deceit and resulted in substantial losses to investors, i.e., the $2.3 million described above. However, while the Court finds that civil monetary penalties are appropriate in this case, considering each sale to the 350

---

[9] "Pursuant to the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, the maximum third-tier penalty for a natural person was adjusted [to $110,000] for inflation for violations occurring after Dec 9, 1996 and before February 2, 2001." (Pl.'s Mem. in Supp. at 24 n.12. (citing 17 C.F.R. § 201.1001).)

investors as a separate violation results in an "unduly penalizing" amount. *See S.E.C. v. Elliot*, 2012 WL 2161647, at *11 (S.D.N.Y. June 12, 2012). Instead, the Court will calculate the civil penalty by considering Knights involvement in the three unregistered stock offerings as separate violations, resulting in a civil monetary penalty of $330,000. The Court deems this amount appropriate to both punish defendant for his conduct and deter future violations, especially where, as here, Knight is already subject to a significant disgorgement award. *S.E.C. v. Balboa*, 2015 WL 4092328, at *5 (S.D.N.Y. Jul. 6, 2015).

### E. Deposition Costs

The SEC argues that "[t]he Court should also include in the judgment entered against Knight the Court's prior order that Knight reimburse the Commission for the cost of various depositions and transcripts." (Pl.'s Mem. in Supp. at 25.) First, they seek Knight's payment for depositions that resulted from the reopening of discovery in 2009 due to defendant's failure to identify during the initial 2005-06 discovery phase numerous documents and witnesses that they later identified as proposed exhibits and witnesses that they planned to call at trial. (*Id.* at 25.) In 2009, both this Court and Magistrate Judge Lindsay ordered the defendants,[10] jointly and severally, to bear the cost of the depositions "as a sanction for . . . belated identification of witnesses who may know pertinent information." (DE 122 ¶ 5, Order of Magistrate Judge Arlene R. Lindsay dated May 20, 2009; DE 141, Declaration of Bennet Ellenbogen ¶ 12, Ex. A at 74-75.) According to the SEC, they incurred costs totaling $20,070.58 for the depositions of Knight, Yeroush, Lida Esrail, Ann Varvaro, Philip Barnard, Marlynn Pawliske, Michael Kamali, William Fjetland, Ben Colonomos, Michael Ahdoot, Todd Jennings, Raymond Chan, Moritz Maroof, Barbara Moffitt, and one cancelled deposition, however, defendant refused to pay these

---

[10] At the time, Yeroush and iShopnomarkup.com, Inc. were still defendants in the action.

costs despite failing to submit any materials exhibiting his financial condition or inability to pay. Accordingly, defendant Knight is ordered to pay the requested $20,070.58 in deposition costs.

Second, the SEC seeks Knight's payment for copies of various deposition transcripts that the SEC provided to Knight during trial despite Knight himself not having ordered them from the various reporters. Specifically, the SEC asks that the Court order "Knight to pay ½ of the cost of the deposition[] transcripts given to him at his request during trial," namely the transcripts from the Patisso, Marrone, Knight, Coon, Mehringer, Wubbenhorst, Davoodi, Neissani, and Yeroush depositions. According to the SEC, the total cost of these transcripts is $8,624.00, and thus Knight should be required to pay half that amount, i.e., $4,132.00. The Court agrees.

## CONCLUSION

For the foregoing reasons, defendant's motion pursuant to Rules 50 and 59 is denied. Plaintiff's motion for post-trial relief is granted as follows: Knight is permanently enjoined from violating Sections 5 and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and 10b-5 thereunder; Knight is permanently enjoined from serving as an officer or director of a public company; Knight is ordered to disgorge ill-gotten gains in the amount of $2.3 million and to pay prejudgment interest on the disgorgement in the amount of $2,519,140.23; Knight shall pay civil monetary penalties in the amount of $330,000; Knight shall pay plaintiff for deposition costs in the amount of $24,202.58. The clerk of the Court is directed to enter the attached judgment and to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
        Sept. 3, 2015

_____/s/_____
Denis R. Hurley
United States District Judge

22